**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RICHARD GONZALES SAMAYOA,
*Petitioner-Appellant,*

v.

ROBERT L. AYERS JR.,
*Respondent-Appellee.*

No. 09-99001

D.C. No.
3:00-CV-02118-
W-AJB

OPINION

Appeal from the United States District Court
for the Southern District of California
Thomas J. Whelan, District Judge, Presiding

Argued and Submitted
August 25, 2010—Pasadena, California

Filed April 4, 2011

Before: Alex Kozinski, Chief Judge, Stephen Reinhardt and
Barry G. Silverman, Circuit Judges.

Opinion by Judge Silverman;
Dissent by Judge Reinhardt

4403

## COUNSEL

Glen Niemy, Bridgton, Maine, for the petitioner-appellant.

Annie Featherman Fraser (argued), Deputy Attorney General, and Raymond M. DiGuiseppe, Deputy Attorney General, San Diego, California for respondent-appellee.

## OPINION

SILVERMAN, Circuit Judge:

It is undisputed that on December 18, 1985, appellant Richard Samayoa beat Nelia Silva to death with a wrench in the

course of burglarizing her home. Samayoa also beat to death Nelia's two-year-old daughter, Katherine. The pathologist estimated that Nelia was struck in the head 24 times. The jury heard testimony that the faces of both mother and daughter were smashed in, their skulls crushed, and fragments of bone penetrated their brains. It is undisputed that Samayoa left Nelia and Katherine naked from the waist down — he said he did that to make the crime look like a rape — and then he stole jewelry from the Silva house that he gave away as gifts to members of his family. The mutilated bodies of both victims were found by Rolando Silva, Nelia's husband and Katherine's father. Photos of the decedents and of the bloody crime scene were introduced into evidence.

Nine years earlier, Samayoa had raped and sodomized a woman with multiple sclerosis, who begged him, "Please don't rape me. I'm a cripple." He was convicted of burglary and rape and sentenced to prison. Five years later, while staying overnight at a friend's home, Samayoa entered the bedroom of the friend's sister and smashed a flower pot in her face in an effort to rape her. She suffered a laceration of her face that penetrated to her cheek bone. He was convicted of assault with a deadly weapon and again sentenced to prison. Samayoa also had a prior conviction for another burglary. Altogether, he had been sentenced to prison three separate times.

At the trial of the double Silva murders, which Samayoa conceded he committed, defense counsel presented testimony from three psychologists and a written report from a fourth to the effect that Samayoa suffers from, among other diagnoses, an organic brain disorder that could explain his violence. In addition, at the penalty phase of the trial defense counsel presented evidence that Samayoa had been a compliant prisoner during his previous incarcerations, proving that he can be safely incarcerated. They also presented evidence from his mother and sisters to the effect that they loved him and hoped his life would be spared.

The jury returned a penalty phase verdict of death after about 80 minutes of deliberation.

Samayoa now claims that his two defense lawyers were ineffective at the penalty phase because they failed to discover and prove that when Samayoa was a child, his extended family physically fought with each other and abused drugs, as did he; that sexual abuse was prevalent in the family, and an uncle may have abused Samayoa at age eight or nine; that Samayoa's family was poor; that his father was a harsh disciplinarian; and that his mother was "emotionally distant."

On state habeas review, the California Supreme Court rejected the claim of ineffective assistance of counsel. It did so on the merits but without further explanation.

The question posed in the present federal habeas petition is whether the state court's decision rejecting the ineffective assistance of counsel claim is contrary to or an unreasonable application of United States Supreme Court law. The district court assumed (without definitively deciding) that Samayoa's trial lawyers fell below the standard of care in not presenting the evidence of Samayoa's childhood at the penalty phase of the trial. However, the district court held that the state court was not unreasonable in denying relief because Samayoa cannot show that he was prejudiced by any supposed failings of counsel. In other words, in light of the atrociousness of the two Silva murders, the heinousness of Samayoa's prior crimes, and the fact that counsel had already presented significant evidence of Samayoa's organic brain disorder to the jury during the guilt phase, the California state court was not unreasonable in deciding that there was no reasonable probability that the jury would have returned a different verdict had it heard the additional evidence about Samayoa's childhood.

We agree with the district court that the California Supreme Court's decision was not contrary to or an unreasonable application of Supreme Court law. The two murders themselves

were uncommonly brutal, and the aggravating evidence horrific. If the evidence of an organic medical explanation for Samayoa's behavior, which the jury *did* hear, did not persuade it to impose a lesser sentence, it was not unreasonable for the state court to decide that the additional evidence probably would not have produced a different verdict. We affirm.

## I.   Facts

### A.   The Crimes

In the direct appeal, the California Supreme Court set forth the facts of the crime:

> In December 1985 Nelia Silva resided with her husband, Ronaldo [sic], and their two-year-old daughter, Katherine, on Piedra Street in Southeast San Diego. Defendant lived across the street from the Silva family. On the morning of December 18, 1985, Ronaldo [sic] Silva walked his daughter across the street to a babysitter's home and left his daughter there. At approximately 6 p.m., Mrs. Silva returned from work and picked up her daughter from the babysitter.
>
> Mr. Silva arrived home at approximately 7:30 p.m. that evening. He opened the garage door, observed his wife's car parked in the garage, and smelled smoke. He entered the kitchen through the interior garage door and found smoke spewing from the stove top where food was burning. After calling out for his wife and receiving no response, he looked down the hallway and saw the bodies of his wife and daughter lying on the floor in pools of blood. After touching his wife and daughter, he realized they were dead and ran outside seeking help. At 8 p.m., San Diego Police Department officers arrived at the Silva residence and entered through the garage. They discovered the bodies of a small child and a woman

lying in the hallway. The child was nude from the waist down, with a large indentation in her head. The woman also was nude from the waist down, wearing only a shirt, and her face was smashed.

Outside the residence, Mr. Silva was comforted by Raul and Deana Samayoa, defendant's brother and sister. Raul and defendant lived across the street with their mother and other members of the Samayoa family.

Detective Richard Carey of the San Diego Police Department arrived at the scene at 9:35 p.m. Approaching the hallway from the kitchen, he observed large pools of blood in the area of the woman's body and the child's head, and blood spattered on the walls and in the three bedrooms off the hallway.

That evening a police department technician searched the area surrounding the Silva residence. He found a wrench and several pieces of jewelry on the ground near an area spattered with blood. He was unable to lift fingerprints from the wrench, the jewelry, or the interior of the residence. Missing from the house were a jewelry box and jewelry, and Mrs. Silva's purse.

Blood samples taken from the two victims and from defendant all were determined to be type A. Mr. Silva knew of defendant, but neither he, nor to his knowledge his wife, ever had spoken with him.

A forensic pathologist, Dr. Robert Bucklin, performed autopsies on both victims. Mrs. Silva's arms, hands, and fingers were covered with multiple bruises and abrasions. She had been struck with blunt force on the head and neck approximately 24

times. Multiple blunt lacerations covered both sides of her head and scalp. Dr. Bucklin testified that a blunt laceration is a crushing type of injury made with a heavy force without a sharp edge. Her jaw bones and teeth were fractured and the left cheek bone was crushed. The eyes were crushed around the orbital ridges on both sides. Upon removal of the scalp, the pathologist observed several skull fractures, one of which had caused a piece of bone to penetrate the brain, and another serious fracture along the skull base that was caused by extensive force.

The pathologist testified that Mrs. Silva would have died within several minutes following the infliction of her injuries. He further testified that the wrench (recovered from outside the residence) was consistent with and could have been the instrument that caused the injuries.

The autopsy of Katherine revealed three injuries, all blunt lacerations of the scalp. One injury on the right side was two inches long and penetrated the skull into the brain, producing hemorrhaging. The most severe injury fractured the skull base. The brain contusions caused hemorrhaging and edema. The wrench was consistent with, and could have been, the instrument that caused the injuries.

A criminalist with the district attorney's office developed a crime scene reconstruction, determining that Mrs. Silva had received many blows while she was lying on the floor. Katherine had been struck once while near the left leg of her mother and then moved along the hallway, smearing blood on the wall, where she was struck again.

Following the commission of the crimes, defendant gave various items of jewelry to family members. He

gave his mother, Mercedes Samayoa, a hair comb, and gave his sister, Deana, a pearl necklace and a bracelet. Defendant's other sister, Inez Sykes, found a man's diamond gold ring sitting on her bathroom counter. Defendant told her that the ring belonged to him. Each of these items of jewelry later was identified as belonging to Mr. or Mrs. Silva.

In January 1986, following defendant's arrest for a violation of his parole in another criminal case, his mother and his sister alerted the police that defendant had given them items of jewelry. On January 20, 1986, Officers Art Beaudry and Ronald Jordan met with defendant's mother, brother, and sisters at the Samayoa residence and collected the jewelry. After the officers informed the Samayoas that a jewelry box also was missing, Raul Samayoa discovered it wrapped in a blanket under a shed in the Samayoa backyard. When shown the wrench that was discovered outside the Silva residence, Raul Samayoa told the officers that it appeared similar to the one he had kept in his tool shed.

*People v. Samayoa*, 938 P.2d 2, 13-16 (Cal. 1997).

On January 31, Samayoa confessed to the killings.

## B.   The Trial

Defense counsel's strategy at the guilt phase of the trial (a strategy that is not challenged here) was to concede that Samayoa had killed the victims and to present for Samayoa a diminished capacity defense aimed at negating the allegations of the special circumstances[1] that would make the case a capital one if proven.

---

[1]The special circumstances alleged were multiple murders and murders in the course of a burglary.

In his opening statement to the jury, defense counsel conceded defendant's guilt of two counts of first degree murder and one count of residential burglary. Counsel asserted that evidence of defendant's brain damage would be presented to establish that at the time of his commission of the crimes, defendant lacked the intent to kill his victims (which intent was, at the time of the commission of the crimes, an element of the burglary-murder special-circumstance allegation) (see *People v. Anderson* (1987) 43 Cal.3d 1104, 240 Cal.Rptr. 585, 742 P.2d 1306). Thereafter, in support of this theory, the defense presented at the guilt phase the testimony of two psychologists, who testified that the results of neuropsychological tests administered to defendant indicated the presence of organic brain damage.

Dr. Meredith Friedman, a licensed clinical psychologist and chief psychologist at the Metropolitan Correctional Center, testified she had been retained by the defense to conduct preliminary neuropsychological testing of defendant. Dr. Friedman explained that the field of neuropsychology involves the relationship of cognitive and perceptual behavior to underlying brain dysfunction. In August 1986, Dr. Friedman conducted a battery of neuropsychological tests, including the Luria-Nebraska series, the Canter Background Interference Procedure, and the Bender-Gestalt visual motor test. (She acknowledged she had no formal training in the administration of the Luria-Nebraska tests.) She also analyzed the results of tests conducted one month earlier, applying the Wechsler Adult Intelligence Scale. Additionally, Dr. Friedman interviewed defendant regarding his history of head injuries, and defendant disclosed he had been rendered unconscious in a bicycle accident at 13 years of age, and again in 1972, when he was

struck on the head by a billy club wielded by a police officer.

According to Dr. Friedman, the test results indicated global intellectual deterioration and brain damage associated with the left parietal, occipital, temporal, and frontal lobe areas of the brain, which would cause hypersensitivity, unmodulated reaction, and overreaction in novel or stressful situations. Such brain damage also would cause episodes of "rage reaction," resulting in an explosive lack of control, and panic in "fight or flight" situations. Dr. Friedman also testified that defendant demonstrated "viscosity," signifying that he obsessively pursued or repeated a single function or response—an action consistent with temporal lobe damage.

* * *

Dr. Saul Saddick, a licensed clinical psychologist, testified that he specialized in neuropsychological assessment, although he does not hold a board certification in neuropsychology. Dr. Saddick administered to defendant the Halsted-Reitman battery of tests and interviewed him regarding his history of head injuries. Dr. Saddick testified that the test results indicated brain damage to the frontal, temporal, and parietal lobes of the brain, which would cause poor impulse control, impairment of reasoning skills, low frustration tolerance, assaultive behavior, and a "short fuse" profile, consistent with frontal temporal damage. Defendant also demonstrated "viscosity" and "perseveration," signifying that once engaged in an activity such as aggressive behavior, he would have difficulty discontinuing his actions. Viscosity and perseveration were consistent with left temporal lobe damage. Defendant's confession to the police was indicative of viscosity, in that his state-

ment was a monologue unresponsive to questions asked, and he spoke in repetitive circles. Persons with the type of brain damage suffered by defendant may experience episodes of "rage reactions," and according to Dr. Saddick it is difficult to determine whether a person locked into a rage reaction is aware of his conduct or, if aware, is able to stop his conduct. He acknowledged that defendant was aware of the difference between killing someone and inflicting serious bodily injury. Dr. Saddick ultimately diagnosed defendant as having an (1) organic "explosive type" personality syndrome, (2) antisocial personality disorder, and (3) moderate cerebral dysfunction.

The parties stipulated that People's exhibit No. 66 was a drawing by defendant of the court reporter, given by defendant to her. The parties further stipulated that Dr. Dixon, the psychologist retained by the district attorney's office who tested defendant on February 3, 1986, observed during the Rorschach test that defendant often perseverated, indicating "organicity" (i.e., brain damage), the origin of which could be alcohol or drug abuse.

*Samayoa,* 938 P.2d at 16-17.

The government presented two experts to rebut the defendant's brain damage evidence. *Id.* at 17-18. On surrebuttal, the defense presented an additional expert:

Dr. Melvin Schwartz, a clinical neuropsychologist and forensic psychologist who was board certified in neuropsychology, examined the same materials reviewed by the other experts. Dr. Schwartz agreed with Dr. Saddick's conclusion that defendant suffered left hemisphere brain damage. Behavior of the type demonstrated by defendant (viscosity and per-

severation) frequently was demonstrated by brain-damaged individuals. He opined that Dr. Saddick competently had administered the tests in the present case, although Schwartz had found errors in Saddick's work in another case.

*Id.* at 18.

The jury deliberated for about 45 minutes and found Samayoa guilty of two counts of first degree murder and one count of residential burglary. The jury also found that Samayoa used a deadly weapon (the wrench) during the crimes, had served three prior prison terms, and had two prior serious felony convictions. Finally, the jury found true the multiple-murder special circumstance allegation — i.e., that in the present case, Samayoa was convicted of more than one count of murder. It also found true the felony murder special circumstances — i.e., that each murder was committed in the course of a burglary. *Id.* at 13.

The penalty phase of the trial then commenced before the same jury. The state presented the following evidence in aggravation:

The 1976 preliminary hearing testimony of Berta Lou Raymond in a prior unrelated criminal prosecution for burglary and rape was read to the jury. (Raymond was deceased and therefore unavailable as a witness.) Raymond testified that she suffered from multiple sclerosis and usually was confined to a wheelchair. On July 8, 1975, at 2:15 a.m., she was at home alone asleep in bed. She was awakened by the sound of the bedroom door opening, and a flashlight was shined in her face. She could hear two men but could not see them. One of the men held a knife at her throat, asking her where she kept her money. When she heard a belt buckle being loosened and a zipper unzip, she screamed, "Please don't rape me,

I'm a cripple." A male voice responded, "I know, I won't hurt you." The man then removed his pants and raped her. At one point he turned her over and entered her rectum with his penis. The initial act of intercourse lasted approximately 15 to 20 minutes. Another man repeatedly entered the bedroom, referring to the man who was raping her as "Jack." She heard a total of three different voices.

\* \* \*

David Drew Anderson was one of the participants in the Raymond burglary and had pleaded guilty to the crimes. In the present proceedings, at the penalty phase of defendant's trial, Anderson testified that on July 7 and 8, 1975, he had been with defendant and James Glasgow, drinking and ingesting heroin. Defendant, recently having been released from custody, needed money. Both defendant and Glasgow lived in close proximity to Raymond, and the three men decided to burglarize her house. They agreed to use fictitious names in the event they needed to communicate with each other while inside the residence. Defendant entered first and began to rape Raymond. Anderson disclosed for the first time (i.e., at the penalty phase of the trial in the present case) that he and Glasgow also had sexually assaulted Raymond. In 1976, Anderson had denied culpability for the rape in order to avoid prosecution for that offense.

The prosecution also presented evidence of defendant's 1981 conviction for assault with a deadly weapon on Elvira R. Rosendo R., the brother of the victim, testified that on the evening of November 13, 1981, he returned from a party, accompanied by defendant. They both fell asleep in Elvira's bedroom. Elvira was alone in her bedroom, asleep.

Elvira testified that she was awakened that evening by someone striking her. Her assailant threatened that he would kill her if she pulled down the covers, and said he wanted to make love to her. When she jumped up, he responded by forcefully striking her in the face. She saw his face and recognized him, crying out, "Oh my God Richard." After she begged him to allow her to wipe her face, he allowed her to leave the room. She was taken to the hospital that evening for treatment for severe lacerations on her face, requiring stitches.

Finally, the prosecution also introduced evidence of defendant's 1974 burglary conviction.

*Id.* at 18-19.

In presenting the case in mitigation, defense counsel built upon the brain damage evidence previously presented, adding testimony from corrections officers and family members.

Paul Dillard, a counselor with the Department of Corrections, testified that in 1981, while defendant was a prison inmate, defendant held a position in the prison kitchen, demonstrating his reliability and responsibility.

Ronald Baldwin, an officer at a correctional facility, testified that he had daily contact with defendant for nearly a year in 1983, and that defendant had been a cooperative, above-average worker.

*Id.* at 19. Similarly, Robert Smith, a retired corrections officer from Soledad Correctional Training Facility, testified that Samayoa worked on his prison crew six hours a day for approximately a year. Smith rated Samayoa's job performance as "very satisfactory."

Samayoa's mother, Mercedes, and two sisters, Inez and Deana, testified. Their testimony was designed to humanize Samayoa and elicit sympathy and mercy for him and his family. They testified that Samayoa was an artist who loved his family. Mercedes identified drawings and hand-made cards Samayoa had made and sent to her and family photographs, including pictures of Samayoa as a child. Mercedes also identified photos the family sent to Samayoa while he was in prison. Similarly, Deana identified a card Samayoa had sent to her. Deana also testified that Samayoa had a seven-year-old son, and Samayoa and his son loved each other very much. Inez and Deana testified that they had cooperated with the police but loved Samayoa and hoped his life would be spared.

The jury deliberated for 80 minutes before returning a death penalty verdict.

Samayoa filed a post-verdict motion to reduce his sentence to a life sentence. The trial court independently reweighed aggravating and mitigating evidence and denied the motion, concluding that the death penalty was "the only fitting response" to the "unspeakable crimes" and that aggravation "vastly outweigh[ed]" mitigation. *Id.* at 44-46. As aggravation, the trial court cited the "overwhelming" evidence of the special circumstances, the "viciousness and brutality of the crimes," the fact that Samayoa "bludgeoned" the victims "to death in the course of . . . a burglary," and the "prior violence against highly vulnerable female victims." *Id.* at 45.

## C. State Appellate and Post Conviction Proceedings

The California Supreme Court unanimously affirmed the convictions and sentence on direct review. *Id.* at 49. The Supreme Court reviewed the motion to reduce sentence and held that the trial court did not abuse its discretion when it reweighed the aggravating and mitigating factors and concluded that the "aggravating circumstances 'vastly outweigh the mitigating circumstances.' " *Id.* at 46.

Samayoa filed his first state habeas petition with the California Supreme Court in 1997, arguing that counsel was ineffective for failing to investigate and present mitigation evidence. On February 23, 1998, while the state habeas petition was pending, the United States Supreme Court denied certiorari on Samayoa's direct appeal. *Samayoa v. California*, 522 U.S. 1125 (1998). On September 27, 2000, the California Supreme Court denied the ineffective assistance habeas claim "on the merits," without explanation.

## D. Federal Habeas Petition

Samayoa filed his first federal habeas petition on January 28, 2002, and amended it in 2005, claiming that counsel was ineffective for failing to investigate and present mitigation evidence at the penalty phase. He filed numerous supporting affidavits providing additional social history. Several family members stated that Samayoa had grown up witnessing violent fights among extended family members, using drugs, and drinking alcohol. One uncle admitted that he and his brothers had tossed Samayoa around like a ball when he was an infant. Several family members claimed that Samayoa's mother, Mercedes, was unaffectionate towards him. Samayoa's father, Ralph, was a disabled war veteran who received disability income and had serious heath problems until his 1982 death. Samayoa and his two brothers stated that their father harshly disciplined them. According to Samayoa's two brothers and mother, one time Ralph disciplined Samayoa by putting Samayoa's hands into a flame as punishment for either burning their father's five homing pigeons alive or for killing a cat. Two cousins stated that Samayoa told them over phone from prison that he had been molested by the uncle at age 9. Samayoa admitted only that the uncle once attempted to molest him. Other relatives described pervasive sexual abuse in the extended family.

Marion Pasas, the defense investigator, signed an affidavit, stating that the investigation was "not as thorough as [she] felt

it should be" and that lead counsel, Michael Popkins, did not spend time with Samayoa's family. Assistant defense counsel, Michael Marrinan, stated in his affidavit that, although he had worked with mental health experts to prepare for trial, he was unaware of abuse in Samayoa's family. Had Marrinan known about abuse, he would have presented the facts to the experts, and to the jury as mitigation evidence.

## E.   District Court's Ruling

The district court accepted all of the affidavits as true, and assumed without deciding that the defense investigation fell below the objective standard of reasonableness. However, the district court held that the California Supreme Court was not unreasonable in deciding that Samayoa suffered no prejudice from the supposed failings of counsel.

The district court assumed that trial counsel could have presented all of the new mitigating evidence, and the court considered it in combination with the previously presented evidence, which included (1) expert testimony that Samayoa suffered head injuries which caused brain damage and caused Samayoa to suffer a "rage reaction" on the night of the murders; (2) testimony by prison officials that Samayoa was a productive prison worker, indicating that he could be safely incarcerated; (3) testimony by Samayoa's two sisters and mother that Samayoa sent them hand-made cards and letters from prison, that his child loved him, and that they felt guilty for having helped convict him; and (4) counsel's arguments that Samayoa helped the police by confessing and that he did not intend to kill the victims.

The district court then weighed all of this evidence against the aggravating evidence. The court noted that the crime in this case involved an extremely brutal double murder of a mother and two-year-old daughter who were bludgeoned to death with a wrench during a burglary. Both victims were half-dressed and both had been struck many times while lying

on the floor. Samayoa subsequently gave the jewelry he stole to members of his family. In addition, the court considered the previous burglary, sexual assault, and assault with a deadly weapon convictions. Considering the extremely violent nature of the murders and his prior crimes, the district court concluded that even if the additional mitigation had been presented to the jury, there was no reasonable possibility that one of the jurors would have voted for life. The district court added that the jurors deliberated on the guilt verdict for less than 45 minutes and on the penalty for less than an hour and a half. The court concluded that the California Supreme Court's rejection of the ineffective assistance claim involved neither an unreasonable determination of the facts nor an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984).

## II. Analysis

### A. Standard of review

The Antiterrorism and Effective Death Penalty Act applies to this case. *Woodford v. Garceau*, 538 U.S. 202, 207 (2003). A federal court may not grant habeas relief unless the decision of the state court "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). We review the district court's denial of the habeas petition de novo. *Wilson v. Czerniak*, 355 F.3d 1151, 1154 (9th Cir. 2004). Because the California Supreme Court denied the ineffective assistance of counsel claim without explanation, we independently review the record to determine whether the state court unreasonably applied *Strickland*. *Id.* "We do not independently decide the contested legal question, but focus on whether the State Court decision should be reversed under the § 2254 standard." *Id.* (citing *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000)).

[1] The clearly established law in this case is the two-prong *Strickland* test. *Wiggins v. Smith*, 539 U.S. 510, 522

(2003). To prevail on the first *Strickland* prong, Samayoa must establish that counsel acted below the objective standard of reasonableness by not conducting a more thorough background investigation. *Porter v. McCollum*, 130 S.Ct. 447, 452-53 (2009). The critical issue is whether, applying prevailing professional norms, trial counsel conducted an objectively reasonable investigation for mitigating evidence. *Id.; Wiggins*, 539 U.S. at 522-23, 533. Our review "includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time,' " rather than in hindsight. *Wiggins*, 539 U.S. at *523.*

**[2]** To assess prejudice, we consider the mitigating evidence that was presented along with the new mitigating evidence and reweigh all of it against the aggravating evidence to determine whether there is a "reasonable probability" that it would have produced a different verdict. *Sears v. Upton,* 130 S.Ct. 3259, 3266-67 (2010); *Wong v. Belmontes*, 130 S.Ct. 383, 386 (2009). Of course, we must consider the totality of the evidence before the jury when determining prejudice. *Berghuis,* 130 S.Ct. at 2264.

### B.   Analysis

**[3]** It is not at all clear that counsel should have been expected to do more to uncover the evidence that Samayoa now claims should have been presented.[2] However, like the

---

[2]The heart of Samayoa's claim is an affidavit of the defense investigator, Marion Pasas, stating that the investigation was "not as thorough as [she] felt it should be" and that lead counsel, Michael Popkins, did not spend time with Samayoa's family. But, Pasas's opinion — which is *only* an opinion — is directly contradicted by the record, which establishes an early mitigation investigation and numerous meetings between counsel and Samayoa. Popkins started the mitigation investigation two years before trial, meeting with the investigator, discussing mitigating evidence with both the investigator and Samayoa, and reviewing prison and criminal records in 1986. Pasas's 1987 letter to Popkins, sent a year before trial, establishes that she had interviewed immediate and extended family mem-

district court, we will assume without definitively deciding that counsel should have found and presented the additional evidence now in issue. We agree with the district court that the California Supreme Court was not unreasonable in deciding that the additional evidence of Samayoa's childhood probably would not have caused a different verdict to be rendered. Here's why:

- The crimes were brutal and horrendous: not just one murder but two, of a mother and her child, and for no other reason than to steal jewelry from their house.

- Samayoa's prior record was also brutal and horrific, terrible crimes marked by vicious cruelty. His

---

bers for mitigation and was obtaining school records. According to Pasas, the family was "very quiet" and did "not give up information easily," the father was "absent most of the time," and the mother was "extremely passive." All of the mental health experts testified at trial that they reviewed school records when they tested Samayoa.

Popkins's contemporaneous notes show 66 meetings with Samayoa before the penalty trial, including meetings to discuss mitigation evidence two years before trial. Similarly, Michael Marrinan's notes show that he met 49 times with Samayoa. Between them, they also interviewed Samayoa's mother, grandmother, aunt, godchild, sisters and brothers before the penalty trial. Despite all of these meetings — some specifically to discuss mitigation — none of Samayoa's immediate family members state that counsel and the investigator failed to ask about abuse or family history. Other relatives were asked to provide information that would put Samayoa in a positive light. During one interview, counsel apparently asked an aunt to provide only such information. But *none* of Samayoa's relative volunteered anything about the abuse they now describe.

After years of investigation, defense counsel has not identified any documents revealing "red flags" of abuse that would require further investigation, either. *Rompilla v. Beard*, 545 U.S. 374, 382-93 (2005) (holding that counsel should have reviewed school and prior conviction records); *Wiggins*, 539 U.S. at 524-25 (holding that counsel should have further investigated where social services records revealed abuse).

three previous trips to prison had not prevented the murders of Nelia and Katherine Silva.

• The jury had been presented with other mitigating evidence, including substantial evidence from psychologists purporting to link Samayoa's violence to an organic brain injury. That evidence was "more significant[ ]" than the "[e]nvironmental factors" he now proffers. *Sears*, 130 S.Ct. at 3262. Prison officials called Samayoa a reliable worker, and his immediate family showed sympathetic cards and photographs and described how Samayoa's son loved him.

• The evidence of Samayoa's childhood does not paint a pretty picture, but it is not so dramatic or unusual that it would likely carry the day for Samayoa given that his much more probative brain injury evidence did not. His story, sadly, is not an uncommon one: harsh discipline, poverty, drug abuse, and violence and sexual abuse among extended family members. It is not clear whether Samayoa was actually sexually abused by an uncle or if the uncle merely made an unsuccessful attempt. Either way, it was a one-time event that pales in persuasive force compared to evidence of organic brain dysfunction that failed to move the jury. Faced with a similar situation in *Wong v. Belmontes*, the Supreme Court said that it was "hard to imagine" that additional facts about Belmontes' difficult childhood would outweigh the facts of the murder he committed — a crime similar to Samayoa's. 130 S.Ct. at 391. Belmontes beat a woman to death with a steel dumbbell bar, crushing her skull with 15 to 20 blows. *Id.* at 390. Samayoa crushed the skulls of *two* people, inflicting 24 blows to the head of the mother and beating to death her helpless young daughter.

### III. Conclusion

In the final analysis, the question is not whether *we* think that the newly-developed mitigating evidence would have averted a verdict of death. We do not think so, but that is not what matters. What matters is whether the California Supreme Court was unreasonable in deciding that the additional evidence would not likely have caused the jury to reach a different verdict. For the reasons we have given, we hold that the California state court's decision was not an unreasonable application of, or contrary to, United States Supreme Court law.[3]

AFFIRMED.

---

REINHARDT, Circuit Judge, dissenting:

This is a capital case in which the trial defense counsel, for reasons that are impossible to fathom, deliberately and knowingly refused to investigate the capital defendant's abusive family background, the type of mitigating evidence that the Supreme Court has repeatedly emphasized is highly relevant to a jury's decision whether to impose the death penalty. *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 535 (2003). In fact, in this case it was the only mitigating evidence by which counsel would have had any realistic chance of persuading the jury to spare his client's life.

Because Richard Samayoa's trial counsel refused to investigate the circumstances of his client's upbringing, the jury that sentenced him to death never learned that he was raised under unimaginably horrific conditions: that he was the victim of constant and severe physical and psychological abuse, that his family environment was rife with sexual abuse of children,

---

[3]We decline to issue a certificate of appealability for the uncertified issue briefed by Samayoa.

and that he had drugs pushed upon him by abusive adult relatives starting at an extremely young age. Samayoa's counsel had no strategic justification for failing to obtain such evidence and present it to a jury, especially as, in light of Samayoa's brutal offense and his past brutal crimes, the only hope of persuading the jury to spare his life was to explain his criminal behavior as a product of the truly depraved conditions which from the outset shaped his existence. The failure to introduce that evidence probably made his death sentence inevitable.

The mitigation case presented by Samayoa's trial counsel not only failed to provide the jury with a single reason to spare Samayoa's life, but likely contributed to some degree to its decision to order him executed. The incompetence of the psychological experts upon whom the defense relied to attempt to prove that Samayoa suffered from organic brain damage must have been evident to all, including the jurors: the "experts" made basic mathematical errors in tabulating test results, diagnosed Samayoa with a non-existent psychological condition,[1] and presented the jury with a mislabeled, upside-down diagram of the human brain. The testimony of the prison guards called by the defense was equally without import: the guards simply testified that Samayoa was "above average," for a prison worker.[2] And the testimony of Samayoa's mother and two sisters was of no assistance to him whatsoever: they testified that they loved Samayoa and would

---

[1]Specifically, one of Samayoa's experts, Dr. Saul Saddick, testified that Samayoa suffered from "Organic Rage Reaction." A government rebuttal expert noted that "Organic Rage Reaction" is not a condition recognized by the American Psychological Association. Even today, more than twenty years later, a Google search for "Organic Rage Reaction" returns only three results, all of which are documents arising from Samayoa's litigation that note there is no such condition as "Organic Rage Reaction."

[2]One correctional officer began by testifying that Samayoa was a "very good worker," and only later revised his assessment by stating that Samayoa was an "above-average worker." Shortly thereafter, that guard stated that Samayoa was, "an okay worker."

feel guilty if he were executed, because they helped turn him in. One sister stated that she would "understand" if the jury sentenced him to death, and both testified that until they learned Samayoa was the culprit they had believed that whoever committed the murders for which he was convicted should be executed. Obviously, such testimony could not possibly have served the purpose of swaying any juror that might have otherwise been inclined to sentence Samayoa to death.

In order to establish that he is entitled to relief based upon his trial attorney's ineffective assistance, Samayoa must demonstrate both that counsel's performance was deficient, and that the deficient performance prejudiced his chances of a verdict of less than death. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Because there is no conceivable explanation for the deliberate and willful refusal of Samayoa's trial counsel to investigate the physical and psychological abuse that permeated Samayoa's upbringing and to obtain information concerning the horrendous experiences that might have been responsible for his criminal conduct, I would hold that counsel's performance in this case was deficient. And in light of the stark gulf between the worthless mitigating evidence presented to the jury and the potentially persuasive mitigating evidence that Samayoa's counsel failed to present, it seems evident that "[h]ad the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537. At the very least the jurors would have been given some basis for understanding why Samayoa became what he did and to ponder whether execution is truly the appropriate remedy for someone whose inexplicable conduct may have been the product of the unconscionable physical and psychological abuse to which he was himself subjected. I therefore dissent from the majority's conclusion that it would have been reasonable for the California Supreme Court to hold that Samayoa was not prejudiced by his counsel's deficient performance.

## I. Deficient Performance

"The proper measure of attorney performance [is] simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. As the Supreme Court has explained, "[r]epresentation of a criminal defendant entails certain basic duties." *Id.* Among these, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. As the Supreme Court has repeatedly recognized, this duty to conduct reasonable investigations includes a specific "obligation to conduct a *thorough* investigation of the defendant's background." *Porter v. McCollum*, 130 S.Ct. 447, 452-53 (2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000) (discussing 1980 ABA Standards for Criminal Justice)) (emphasis added); *see also Wiggins*, 539 U.S. at 523-29.

In his collateral challenge of his conviction, Samayoa submitted a declaration from Michael Marrinan, who served as his co-counsel during his trial. Marrinan stated that Samayoa's defense lawyers were unaware of the abusive circumstances in which he was raised and "had no tactical reason for not discovering [his abusive upbringing] and in not presenting this information to . . . the jury as mitigation for the crimes." This concession alone would probably suffice as evidence that, under *Strickland*, Samayoa's attorneys did not make "a reasonable decision that [made] . . . investigation [of Samayoa's background] unnecessary." *Strickland*, 466 U.S. at 691.

However, the record in this case demonstrates that Samayoa's trial counsel not only failed to discover the abusive circumstances of Samayoa's childhood, but also actively resisted conducting investigations that would have revealed this information. Maria Pasas, who served as an investigator for the defense during Samayoa's trial, sent a letter to lead counsel Michael Popkins prior to trial informing him that Samayoa's "family are very quiet and do not give up informa-

tion easily," but that "[t]he picture seems to be emerging of a rather marginally functioning family." On habeas, Pasas provided a declaration stating that despite this letter and despite her attempts to persuade Popkins to investigate Samayoa's background:

> [Samayoa's] attorneys did not understand or seem interested in the penalty phase. There was no strategizing about the penalty phase and the penalty phase investigation was not up to par. . . . Mike Popkins did not spend time with [Samayoa's] family. I had to force him to go see [Samayoa's] grandma Inez.

Similarly evidencing Popkins's active unwillingness to investigate Samayoa's family background is a habeas declaration from Samayoa's aunt stating that when she was interviewed by Popkins in preparation for the penalty phase,

> [Popkins] did not want to hear what I had to say . . . The attorney told me that he did not want to hear negative things about [Samayoa] or the family. He did not ask me many questions and he spent less than a half hour with me. If Mr. Popkins had asked or permitted me to tell him about the molests, abuse, violence, alcohol and drug use that existed in my extended family, I would have done so.

This evidence stands uncontradicted in the record. The record thus demonstrates that Samayoa's counsel did not just fail to conduct even the most cursory of investigations into the possibility that Samayoa was abused, but actively resisted doing so. There is no conceivable strategic basis for Popkins's failure to so much as ask basic preliminary questions of Samayoa's family regarding a potentially crucial avenue of mitigation evidence, and, even if there were, the uncontradicted declaration of Michael Marrinan makes clear that trial counsel's failure to discover Samayoa's history of physical

and psychological abuse was not based upon such "a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.

To be sure, a truly determined and creative jurist could engage in speculation and conjure up fanciful strategic justifications for Popkins's refusal to investigate Samayoa's background. One could, if one were particularly imaginative, speculate that Popkins was concerned that questions as to Samayoa's childhood would alienate his family, and result in their refusal to testify. In such case, the jurors would not have heard that although his family had initially felt that the perpetrator of Samayoa's offense deserved to be executed, they appreciated the greeting cards he occasionally sent them from prison. Or perhaps Popkins felt that he could not afford to divert his focus from the correctional officers who would testify that Samayoa was an above-average worker. However, even if such flights of fancy could provide a minimally colorable strategic rationale for counsel's refusal to investigate Samayoa's background (which they plainly cannot), Samayoa's lead counsel did not provide any statement to that effect, and second counsel stated that no such strategic calculation justified the refusal to investigate. On the basis of the record before us, it would be nigh impossible for a fairminded jurist to deny that the "decision not to investigate [Samayoa's background] did not reflect reasonable professional judgment." *Porter*, 130 S.Ct. at 453. To the extent that the California Supreme Court's denial of Samayoa's ineffective assistance claim reflected a contrary conclusion, it was "contrary to, or involved an unreasonable application of," 28 U.S.C. § 2254(d)(2), *Strickland*'s requirement that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691.

The majority's half-hearted effort to suggest that trial counsel's performance may have been adequate does not address the actual basis of Samayoa's ineffective assistance claim.

That, as the majority emphasizes, Samayoa's attorneys met with him dozens of times and even spoke with several of his family members is simply irrelevant. Samayoa does not claim that his trial lawyers failed to put in adequate "face time" or that they never met with his family members. Rather, he argues that his defense team deliberately, though inexcusably, refused to so much as consider the possibility that his upbringing was anything other than ideal, failed to investigate the most elementary but critical factual area of mitigation law, and accordingly failed to present in mitigation the only evidence that might have caused one or more jurors to conclude that his brutal criminal history was attributable to anything other than his innate depravity. Innumerable cases and studies show that individuals who commit vicious violent acts are often, like Samayoa, themselves victims of unspeakable past abuse, *See, e.g.*, *Wiggins*, 539 U.S. 510; *Rompilla v. Beard*, 545 U.S. 374 (2005); *see also* W.H. Auden, September 1, 1939 ("I and the public know / What all schoolchildren learn / Those to whom evil is done / Do evil in return."), and the Supreme Court has accordingly made clear that evidence of such abuse is of the greatest importance to a jury's assessment of a defendant's culpability. *See, e.g.*, *Wiggins*, 539 U.S. at 535.

The only argument that the majority provides that is responsive to this claim is its suggestion that counsel's performance was acceptable because there were no " 'red flags' of abuse that would require further investigation." In the same footnote in which the majority states that there were no red flags, it quotes extensively from Pasas's letter to Popkins, while conveniently omitting the letter's conclusion that "[t]he picture seems to be emerging of a rather marginally functioning family." Such an observation would have alerted a competent attorney to the possibility that Samayoa's family background was worth investigating, but evidently this was a possibility in which Popkins was not the least bit interested. Moreover, while the absence of "red flags" might possibly excuse a lawyer who simply fails to ask certain questions, it

cannot justify a trial attorney's affirmative rejection of a potentially valuable line of death penalty mitigation evidence, without even the most minimal investigation. In *Wiggins v. Smith*, 539 U.S. 510 (2003), the Supreme Court found counsel's penalty-phase performance deficient because "counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Id.* at 524. Here, counsel actively resisted acquiring even a "rudimentary knowledge" of Samayoa's family background, let alone undertaking the "requisite, diligent investigation into his client's troubling background and unique personal circumstances." *Williams v. Taylor*, 529 U.S. 362, 415 (2000) (opinion of O'Connor, J.). Such inexplicable unwillingness to discharge one's basic responsibilities, wholly unredeemed by any identifiable strategic consideration, presents a clear-cut case of deficient performance. Regrettably, rather than acknowledge even that obvious point, the majority decides not to confront the question and concludes instead that "the California Supreme Court was not unreasonable in deciding that the additional evidence of Samayoa's childhood probably would not have caused a different verdict to be rendered."

## II.    Prejudice

To establish prejudice, a habeas petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694. "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' " *Harrington v. Richter*, 131 S. Ct. 770, at 787-88 (quoting *Strickland*, 466 U.S. at 687, 693, 694) (citations omitted). Because a unanimous verdict was required to sentence Samayoa to death, however, counsel need only show a reasonable proba-

bility that a single juror would have weighed his culpability differently if made aware of the horrendously abusive circumstances in which he was brought up. Here, where the crimes were horrendous, the evidence presented in mitigation utterly impotent, and the mitigation evidence not presented to the jury was powerful and offered the only conceivable explanation for Samayoa's depraved behavior, I believe that it is self-evident that the unpresented "mitigating evidence . . . might well have influenced" one or more jurors' "appraisal of [Samayoa's] culpability," and therefore that "the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing." *Rompilla*, 545 U.S. at 393 (citations and internal quotations omitted).

### A. Mitigation Evidence Not Investigated or Presented to the Jury

Had Popkins, rather than insisting that he "did not want to hear negative things about [Samayoa] or the family," conducted an investigation of the sort conducted by Samayoa's habeas counsel, he would have uncovered mitigation evidence far more substantial than the majority acknowledges. Samayoa, it turns out, was raised in an extended family in which sexual, physical, psychological, and substance abuse occurred as a matter of course. As one psychology expert retained by Samayoa for his habeas proceedings put it, "[i]n family systems theory, the Gonzales/Samayoa family is a catalogue of classic and severe dysfunction." The expert described the family as a "locked system that kept its members prisoners to corrosive and corrupt influences from generation to generation." Another expert stated that Samayoa's family was "a casting director's dream of violence, sexual abuse, alcoholism, drug abuse, and criminality."

Samayoa was raised in a savagely violent family environment. Adult members of his extended family viciously beat one another bloody in front of children at family gatherings

"pretty much every weekend."[3] The declarations of Samayoa's cousins paint a picture of brutal, senseless violence among family members on a basis so routine as to amount to a ritual of sorts: Samayoa's uncles beating their father (Samayoa's grandfather) in front of his grandchildren; outsiders at family gatherings being set upon and beaten, parties that "always ended up with major fights and blood on the walls."[4] Not surprisingly for a family in which "[v]iolence was a way of life,"[5] Samayoa himself was regularly and severely beaten by his father, who did not work and spent his family's welfare benefits on liquor. One family member recalls that, "[Samayoa's] dad would beat the shit out of the boys," and that Samayoa drew a disproportionate share of his father's beatings, apparently because he refused to cry. That relative states that, "[w]hen . . . [Samayoa] was thirteen or fourteen years old, I saw him get beat five to ten times a month." Another relative recounts that Samayoa's father would lie on the family's couch with a belt rolled up at his side, so that he would be able to beat his children with its buckle at a moment's notice. Nor were belt buckles his only means of brutalizing his children: Samayoa's mother recounted that, "[o]nce, when my husband was very angry with Richard, he put Richard's hands in a flame to punish him."

In addition to pervasive physical abuse, Samayoa was raised in a family in which sexual abuse of minors at the hands of adult relatives was a common occurrence. During Samayoa's state habeas proceeding members of Samayoa's extended family submitted largely consistent declarations attesting to adult relatives' regular sexual abuse of the Samayoa family's children. Those declarations discuss family gatherings in which various pedophile uncles enjoyed ready access to Samayoa and his cousins. One of Samayoa's cousins

---

[3]Declaration of Marie Alarcon.

[4]Declaration of Bernadene Severns.

[5]Declaration of Marie Alarcon.

explained that, "[s]exual molestation happened quite a bit in my family. [Samayoa's] uncle David Gonzalez molested most, if not all of the kids in [Samayoa's] generation." Other males in Samayoa's family likewise engaged in incestuous sexual abuse of their minor relatives, including Samayoa's great-uncle Sal Celestin, Samayoa's second cousin Juan Gonzales, Samayoa's uncle Eddie, and Samayoa's uncle "Chat." While Samayoa denies having been molested himself (as male victims of sexual abuse often do), his relatives suggest that he may well have been molested by his uncle Chat when he was eight or nine years old. Samayoa acknowledges that when he was a child his uncle Chat tried to lure him into his bedroom, but claims he sensed something was amiss, and avoided his uncle's advances.

Moreover, had Popkins been inclined to investigate Samayoa's family history, he would have learned that nearly every member of Samayoa's extended family abused drugs and alcohol, that Samayoa's father was an alcoholic who frequently wet his pants at family events, and that Samayoa's uncles were habitual drug users who initiated Samayoa into substance abuse at an early age. At Samayoa family gatherings, adults did not stop young children from simply taking beer from the fridge and drinking it; they were, according to one of Samayoa's cousins, "too drunk to notice." Samayoa's cousin, Benny Girdley, states that when he "was in the fourth grade and . . . [Samayoa] was around seven or eight," they were given pot and alcohol by their substance-abusing uncles. By the eighth grade, Samayoa and Girdley abused hallucinogens together frequently; by the tenth grade, they abused PCP. Not long after, Samayoa and Girdley began using crystal methamphetamine. Samayoa's abuse of crystal methamphetamine would continue until his arrest in this case.

The majority, after considering this same evidence, dismisses his upbringing as, "sadly . . . not an uncommon one." *Maj. Op.* at 4424. I'm not aware how and where my colleagues obtain their information about family life in this coun-

try, but I must strongly disagree. Common or not, the defining events of Samayoa's family life were as follows: near-weekly parties in which he routinely witnessed his adult relatives senselessly beating one another; in which he was given free access to alcohol; and in which he and his cousins were left to their own guile in avoiding sexual abuse at the hands of various pedophile uncles. Away from these parties, Samayoa was constantly and brutally abused by his alcoholic father, and was pushed to abuse serious narcotics by the uncles to whom he looked up. As a psychiatrist retained by Samayoa for his habeas petition put it, "to label Mr. Samayoa's developmental periods as having significant abuse [would be] a gross understatement. The extended family in which Mr. Samayoa was reared is so extreme as to almost defy belief." In short, his was hardly an upbringing that was "not uncommon."

Evidence of Samayoa's tortured background would have provided the jury with a basis for concluding that he "ha[d] the kind of troubled history [the Supreme Court has] declared relevant to assessing a defendant's moral culpability." *Wiggins v. Smith*, 539 U.S. 510, 535 (2003). As one expert report submitted in support of Samayoa's habeas petition explains, Samayoa's criminal history cannot be fully understood apart from his uniquely pathological upbringing:

> Mr. Samayoa's psychological profile is not one that can be easily condensed by the shorthand of conventional psychiatric diagnosis. His behavior can be much better understood when viewed in the context of his longitudinal psychosocial development which was rife with abuse (sexual, physical and emotional), and extreme dyssocialization. . . .
>
> Given this severe dyssocialization rampant throughout most, if not all, of Mr. Samayoa's life, it becomes understandable that he has frequently interfaced with the criminal justice system. His rearing

left him confused in most dealings with other indi-
viduals as to appropriate roles and behavior. His
upbringing also rendered him incapable of benefit-
ting from feedback correction of his behavior. . . .

In my opinion, the effect of this pervasive dyssocial-
ization upon Mr. Samayoa would be to make his
reactions in situations of stress very unpredictable,
with exception that they would most likely in all
cases suffer from lack of impulse control. . . . Mr.
Samayoa has been so exposed to physically destruc-
tive rage in the family setting in which he was reared
as to virtually make it normal for him.

The Supreme Court has stated that such evidence regarding a
defendant's troubled background is relevant to death penalty
sentencing decisions "because of the belief, long held by this
society, that defendants who commit criminal acts that are
attributable to a disadvantaged background . . . may be less
culpable than defendants who have no such excuse." *Penry v.
Lynaugh*, 492 U.S. 302, 319 (1989). Samayoa's background
was not simply "troubled" or "disadvantaged"; it was cruel,
warped, twisted, and pathological. In short, the evidence that
Samayoa's trial counsel neglected was powerful and directly
relevant to the sentencing jury's assessment of Samayoa's
culpability.

## B. Mitigation Evidence Actually Presented to the Jury

Having failed to investigate and present to the jury the cir-
cumstances of Samayoa's upbringing, his trial counsel instead
relied on three types of mitigating evidence, each of which
was not only completely unpersuasive, but likely counterpro-
ductive. First, Samayoa's counsel referred the jury to the
diagnoses of two psychological experts[6] who had testified

---

[6]A third expert, Dr. Melvin Schwartz, was called by the defense as a
sur-rebuttal witness. Dr. Schwartz testified that although he had not him-

before it at the guilt phase of the trial. The experts had told the jury that Samayoa suffered from organic brain damage and could not form the requisite intent to commit first-degree "special circumstance" felony murder, as defined by California at that time. The jury implicitly rejected the testimony of these experts when it convicted Samayoa, and it did so with good reason.[7] Both psychologists were manifestly inept and lacked credibility. The first, Dr. Meredith Friedman, conceded under cross-examination that she had made a number of errors in calculating Samayoa's test results (including several involving simple arithmetic); that she administered an out-dated test to Samayoa and was unaware that the test had been substantially overhauled; that her only formal training in neuropsychological evaluation was a week-long training pro-gram for the administration of a test other than the one that she administered to Samayoa; and that a number of Samayoa's test results indicated that he was not brain dam-aged. This is but a sample of Dr. Friedman's lack of compe-tence and understanding of the subject matter, as a fuller account would require reprinting a fair amount of her cross-examination.[8]

---

self tested Samayoa for brain damage, he had reviewed test results com-piled by one of Samayoa's two main experts, Dr. Saul Saddick, and believed that they supported a diagnosis of left-hemisphere brain damage. Dr. Schwartz further testified that he believed Dr. Saddick to have over-diagnosed brain damage in other cases, and that he had testified in an ear-lier case that he "believe[d Dr. Saddick] to be trained rather than well trained."

[7]While it is of course possible that in some cases the jury would reject organic brain damage as a reason to negate intent, but still be influenced by it in its assessment of a defendant's culpability, counsel clearly had no basis to expect the jury to do so here, where the record reflects that the defense's psychological experts blundered repeatedly and were generally lacking in competence.

[8]Consider, for example, the following exchange:

Q: I am asking you to localize the injury based upon the results of your tests, if you are capable of doing that.

The credibility of the second psychological expert upon whom the defense relied, Dr. Saul Saddick, likewise had been destroyed by the prosecution at the guilt phase of the trial. There, one government rebuttal witness testified that Saddick had diagnosed Samayoa with a psychological condition not recognized by the American Psychological Association. Another testified that Saddick had presented to the jury a diagram of the human brain that was upside-down and mislabeled, and observed (perhaps unnecessarily) that a person who could not correctly label a diagram of the brain was not competent to analyze the existence and behavioral implications of brain damage. Moreover, both Dr. Friedman and Dr. Saddick might well have bolstered the prosecution's case for sentencing Samayoa to death by testifying at the trial that they believed him to be a sociopath, a diagnosis that is notoriously unresponsive to treatment, and that any competent defense lawyer would work diligently to avoid introducing into evidence. In short, by the sentencing phase of the trial, Samayoa's counsel must have been aware that when they testified at the trial his psychological experts had been damaging to the defense, and that the jury had implicitly rejected their brain damage theory by rejecting the defense of inability to form the requisite intent. Nonetheless counsel proceeded to rely upon their prior testimony as the key to defendant's miti-

---

A: Well, the injury wasn't localized. The injury — and I don't even know if it was an injury. We are talking about dysfunction. I don't know if it came from an injury or not. . . .

Q: . . . Locate, if you can, the specific area of the dysfunction within those specific parts of the brain.

A: I can't.

Q: Okay. Because it's impossible to do that, or you don't have the training?

A: I think somebody who may be more sophisticated in this would be able to pinpoint it better. I am just saying that this is what the test suggested.

gation case, and sought to find no other experts who might testify at the sentencing hearing and offer testimony that might truly be mitigating. To rely on the trial witnesses' testimony regarding organic brain damage a second time rather than to seek out and introduce evidence of Samayoa's shockingly abusive childhood almost certainly sealed his fate.

The second type of mitigating evidence upon which the trial counsel relied was the testimony of three correctional officers who had supervised Samayoa's work while he was in prison and lukewarmly praised his qualities as a worker. One testified that Samayoa was a "very good worker," but later stated that Samayoa was an "above-average worker," and when pressed further, "an okay worker." Another, testified that "[Samayoa] was an average worker, and sometimes even above average." Yet a third correctional officer stated that Samayoa's position as a "beverage man" in the prison cafeteria indicated Samayoa was a reliable worker, but conceded that he had not actually had any hands-on experience working with Samayoa. Much like the psychological "expert" testimony, the prison guards' testimony was clearly unhelpful and possibly counterproductive, for to present as his best possible witnesses prison guards who testified that he is a "sometimes . . . above-average" prison worker suggested that there was truly very little to be said on his behalf.

Finally, counsel presented the testimony of Samayoa's mother and two sisters. Samayoa's mother identified several old photographs of Samayoa with his family, showed the jury a Valentine's Day card he had sent her from prison reading "Sweetheart of the Year," and related that because she had helped turn Samayoa in to the police, she would feel guilty if he received the death penalty. One of Samayoa's sisters, Inez Sykes, testified that she had no regrets about turning him in, and that before she learned that her brother was the murderer she had told her family that she felt "a person who'd do something like that deserved anything they had coming to them." She testified that if he received a death sentence, she would

"understand." His sister Deanna testified that Samayoa had a son who was very fond of him, although he rarely saw his father. She further testified that, Samayoa was "not fit to be on the street . . . but I would not like to see him get the gas chamber." Much like her sister Inez, Deanna Samayoa testified that before she learned that her brother was the killer, she had told others that she felt whoever was responsible for the killings deserved "to get it."

Needless to say, the jury was unlikely to be swayed toward mercy by such testimony. Indeed, one would expect that any juror already willing to consider imposing a death sentence would feel validated in doing so by Inez's testimony that she would "understand" such a vote, not to mention both sisters' testimony that before learning of Samayoa's guilt they had felt that the perpetrator of his offenses deserved the death penalty. Moreover, the testimony of Samayoa's relatives gave the jury the impression that Samayoa committed his crimes despite coming from a normal and loving family background, when in fact nothing could have been further from the truth.

In sum, this pathetic mitigation presentation likely did more harm than good to Samayoa's prospects of a sentence other than death. Trial counsel asked the jury to spare Samayoa's life based upon the prior testimony of psychological experts whose many blunders included basic mathematical mistakes, the administration of an outdated test, the mislabeling of an upside-down diagram of the human brain, and the diagnosis of Samayoa as a sociopath. He also presented the testimony of three prison guards who testified principally that Samayoa was somewhat above-average for a prison worker, and of family members who testified that they loved Samayoa and would feel guilt if he were executed because they turned him in, but would understand if the jury chose a death sentence. At no point did the jury hear a word about Samayoa's depraved and abusive upbringing, and, in fact, it was led to believe by the testimony of his mother and sisters that he was raised in a normal and loving household.

*C.    Confidence in the Outcome*

The question before this court is whether the California Supreme Court unreasonably applied United States Supreme Court law in its apparent conclusion that there was not "a reasonable probability that, absent [counsel's] errors, the [jury] . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 694. A reasonable probability is a probability of a different verdict that is "sufficient to undermine confidence in the outcome." *Id.* at 695. Because a unanimous verdict was required to produce a death sentence in this case, one cannot be confident in Samayoa's death sentence unless one is confident that not a single one of the twelve jurors would have been moved to vote for a sentence of life without parole had he heard the unpresented evidence of Samayoa's physically and psychologically abusive childhood.

The jury was instructed that:

> [t]he weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting . . . . You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors that you are permitted to consider.

The evidence that was not presented was of crucial importance to the individualized, open-ended moral deliberation in which the jury was instructed to engage. As noted earlier, the Supreme Court has explained that a defendant's "troubled history" is "relevant to assessing a defendant's moral culpability," *Wiggins*, 539 U.S. at 535, "because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (*quoted in Wiggins*, 539 U.S. at 535).

Each of the twelve jurors would have almost certainly differed to some degree with respect to how much "moral or sympathetic value" he chose to assign to the nightmarish circumstances of Samayaoa's childhood and the effect it had on him during his adulthood. Given that each juror in this case was called upon to weigh the aggravating and mitigating circumstances in light of his own empathy and moral judgment, counsel's failure to inform the jury that Samayoa was raised in an unimaginably abusive environment, both physically and emotionally, would, alone, suffice to call into question any "reliance on the outcome of the proceeding." *Strickland*, 466 U.S. at 692. But this case involves more than just counsel's failure to obtain and present readily available evidence going directly to Samayoa's moral responsibility; for what the jury heard instead was a mitigation case that almost certainly sealed Samayoa's death sentence, a case consisting of discredited experts, lukewarm prison guards, and family members who misleadingly testified that Samayoa was raised in a loving environment. I therefore would hold, in line with *Porter*, 130 S.Ct. 447, *Rompilla*, *545 U.S. 374, and Wiggins*, 539 U.S. 510, that it would have been an unreasonable application of *Strickland* for the state court to conclude that Samayoa was not prejudiced by his counsel's inexcusable performance.

In coming to a contrary conclusion,[9] the majority first emphasizes the undeniable brutality of Samayoa's crime, as well as that of his prior offenses. However, in *Rompilla*, 545

_____

[9]The majority applies an incorrect standard. The question is not, as the majority suggests, whether effective assistance of counsel "probably would not have produced a different verdict." *Maj. Op.* at 4408. *Strickland* clearly states that, "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." 466 U.S. at 693. However, despite applying the wrong standard the majority appears to conclude that counsel's failure to present the troubling circumstances of Samayoa's upbringing and his decision to instead present a mitigation case that would almost certainly lead to a sentence of death, is not "sufficient to undermine confidence" in Samayoa's death sentence. Accordingly, we can overlook that particular error.

U.S. 374, the Supreme Court held that a defendant with a similarly brutal crime and a similar criminal record was entitled to habeas relief due to his counsel's failure to introduce evidence of a traumatic, abusive upbringing. The defendant in *Rompilla* was convicted of murdering his victim during the course of a robbery in which he stabbed the victim multiple times, "including 16 wounds around the neck and head," *id.* at 397, beat the victim with a blunt object, and gashed the victim's face, "possibly with shards from broken liquor and beer bottles found at the scene of the crime," *id.* He then set his victim's body on fire. *Id.* Moreover, like Samayoa, the *Rompilla* defendant had a "significant history of felony convictions," *id.* at 378, including a rape conviction for an offense in which he held his victim at knifepoint, slashed her breast, and "raped her for over an hour," *id.* at 402 (Kennedy, J., dissenting). Despite the brutality of the offense and past convictions in *Rompilla*, the Court nonetheless held that the defendant was prejudiced by his counsel's failure to investigate and provide the jury with certain mitigating evidence, such as the fact that Rompilla had abused alcohol from an early age and been raised in a highly abusive environment. *Id.* at 391-93. While this case and *Rompilla* differ in some factual respects, as any two cases necessarily will, *Rompilla*'s holding forecloses the majority's pat conclusion that because Samayoa's crime and past convictions were brutal the judicial system need not concern itself with the fact that he was sentenced to death despite his attorney's failure to investigate or present the jury with the powerful mitigating evidence of his horrendous upbringing and the shocking abuse to which he was subjected throughout his youth.[10]

---

[10]The majority emphasizes the Supreme Court's recent statement in *Wong v. Belmontes*, 130 S.Ct. 383 (2009), that it is "hard to imagine" that the defendant in that case, who was convicted of a brutal murder, would have received a lesser sentence had his counsel presented additional evidence regarding his abusive childhood. However, the facts that the Supreme Court felt were unlikely to sway the jury in that case were that the defendant's baby sister died of a brain tumor when he was five years old, that his grandmother suffered from alcoholism and prescription drug

The majority next suggests that counsel's failure to introduce any evidence of Samayoa's upbringing did not prejudice him because the evidence of organic brain injury that was presented during the guilt phase of his trial is a type of evidence that is "more significant" than "environmental factors." *Maj. Op.* at 4424 (quoting *Sears v. Upton*, 130 S.Ct. 3259, 3262 (2010)). Even if it is true that evidence of organic brain damage is, as a general matter, "more significant" than evidence of childhood abuse, that is certainly not the case where the defense's psychological experts are exposed as inept and are discredited, and the jury has already implicitly rejected their testimony that the defendant suffers from organic brain damage. *Actual* evidence of many years of severe physical and psychological abuse is undeniably "more significant" than evidence of organic brain damage that is not credible, and that has already been rejected by the very jury that will determine the capital defendant's fate. Here, counsel failed entirely to present uncontroverted mitigating evidence that is of undeniable import, choosing instead to refer the jury to the discredited evidence it had already rejected.

## III. Conclusion

Recently, in an en banc opinion joined by one member of the majority, this court held that the "dynamics of the jury process" are so delicate that if a jury reports that it is unable to agree upon a final sentence in a capital case in which it is presented with a number of sentencing choices, a trial judge

---

addiction, and that his extended family lived in a state of "constant strife." *Id.* at 388. Those facts, while far from a picture of a happy childhood, pale in comparison to the deranged and profoundly abusive environment in which Samayoa was raised. Moreover, Belmontes did not purport to overrule *Rompilla*. There is no presumption that a jury will necessarily sentence to death any individual convicted of a particularly brutal offense. At present the law provides that even individuals convicted of particularly brutal crimes have a Sixth Amendment right to effective representation during the penalty phase of their proceedings.

should not be required to ask if the jury is deadlocked on the question of eligibility for the death penalty, for fear that such questioning might somehow influence the jury's deliberations. *See Harrison v. Gillespie*, ___ F.3d ___, 2011 WL 546585 (9th Cir. 2011). This court's belief that a jury's decision in a capital case can be so easily swayed led to the conclusion in *Harrison* that the Double Jeopardy Clause did not bar the defendant from being charged with capital murder a second time, even though the jury in his first trial appeared to have concluded that he was not eligible for execution. In the present case, a belief that juries can be so easily swayed would compel a finding that Samayoa was prejudiced by his trial counsel's failure to introduce mitigating evidence of the nature that the Supreme Court has repeatedly held to be relevant to a jury's assessment of a capital defendant's culpability. Yet here, my colleagues' view that even a judge's questions might influence a jury's verdict in a capital sentencing case has mysteriously disappeared and is nowhere to be found in the majority opinion. Instead they find the failure of counsel to inform the jury of the mitigating evidence most relevant to the question of the appropriate punishment to be of no possible consequence.

The Supreme Court's ineffective assistance of counsel jurisprudence calls upon us to determine how each member of a jury that was convened twenty-three years ago would have responded to evidence that was never presented to it. In light of the significant difficulties inherent in such speculation, I believe that it is an act of significant hubris for the majority to assure us, on the basis of a highly abbreviated analysis, that the California Supreme Court would have been reasonable in concluding that Samayoa was not prejudiced by his counsel's incompetence. It is, without question, difficult to speculate intelligently as to how each of twelve jurors would have responded to the evidence that Samayoa's trial attorney failed to present. For that very reason, when the deprivation of a defendant's constitutional rights results in the jury's not hearing the only mitigating evidence that could have led to a sen-

tence other than death, I think it clear that the "errors [are] so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. Here, however, the majority and I need not decide this case on that basis alone: it is clear both under the facts and on the law that the evidence that Samayoa's counsel failed to investigate, discover, and present to the jury deprived the jurors of the opportunity to consider the substantial damage wreaked on Samayoa during his childhood and its relation to his subsequent criminal conduct. Counsel's unquestionably ineffective performance with regard to this critical mitigating evidence necessarily undermines one's confidence in the jury's verdict.

I dissent.